

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-300-CV

IN THE INTEREST OF M.C.,
A CHILD

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant L.B. appeals from the termination of her parental rights to her son, M.C. Because we hold that the trial court found that Appellant understood the service plan and proceedings; that even if the law required her to be competent, the record does not raise a bona fide doubt of her competence; and that she has not proved that her trial counsel was ineffective for failing to request a competency evaluation, we affirm the trial court's judgment.

**Background Facts**

At the initial adversarial hearing held June 25, 2008, the following transpired:

---

[1] *See* Tex. R. App. P. 47.4.

THE COURT: All right. So you do not have an attorney to represent you. Is that correct, ma'am?

[APPELLANT]: Yes.

THE COURT: All right. It's my understanding that you have had an opportunity to review the proposed order that has been submitted to the court and further my understanding that you have agreed to that order. Is that correct?

[APPELLANT]: Yes.

THE COURT: You do understand that you have the right to retain an attorney, to hire an attorney to advise you before you enter into any agreement before the court?

[APPELLANT]: Yes.

THE COURT: And further, if you were indigent, if you were truly too poor to hire an attorney, the court would appoint one to represent you in this type of case. Do you understand that?

[APPELLANT]: Yes.

THE COURT: And despite the fact that you do not have an attorney here today, you're asking the court to go ahead with this hearing and approve the agreed temporary order which has been presented. Is that correct?

[APPELLANT]: Yes.

Next, Appellant was questioned by the attorney for the Texas Department of Family and Protective Services (TDFPS):

Q.    . . . I introduced myself with [sic] you this afternoon. Is that correct?

A.    Yes.

Q.    And I explained to you what the purpose of the hearing today was.  Is that correct?

A.    Yes.

Q.    And in doing that, I told you that you had four options on how to proceed with the hearing today.  Do you recall that?

A.    Yes.

Q.    And I told you that you could apply to the court for a court-appointed attorney.

A.    Yes.

Q.    It being that you're homeless and that you don't have a job at this time that you would very likely qualify?

A.    Yes.

Q.    Okay.  And I also told you that you could inform the court that you wanted the hearing to be reset so you could have time to hire an attorney on your own if you would like.  Is that correct?

A.    Yes.

Q.    And the other two options I gave you was to have an opportunity to go over the order with Cassidy Baker, the CPS supervisor, and you could make a decision on whether you agreed with the order, and if you agreed with the order, you could sign that you agreed and we'd have a short hearing in front of the court.  Do you recall that?

A.    Yes.

Q.    And the last option I gave you was if you did not agree with the order that you could represent yourself today and ask the judge to make an independent decision on whether she believed that your child needed to stay in care.  Is that correct?

3

A. Yes.

Q. And you've decided that you're in agreement with [M.C.] remaining under the conservatorship of the Department at this time. Is that correct?

A. Yes.

Q. And prior to you signing the paperwork, we gave you an opportunity to sit down with your friend David and discuss the paperwork with him if you had any questions or if you wanted his input. Is that correct?

A. Yes.

Q. Okay. Now, you've been previously diagnosed with a mental illness. Is that correct?

A. Yes.

Q. And which mental illness is that, ma'am?

A. Bipolar.

Q. And are you currently taking your medication?

A. No.

Q. Do you feel that your failure to take your medications affects your thinking process in any way?

A. Yes.

Q. Do you feel that it's affected your thinking process today for this hearing?

A. No.

Q. Okay. So you believe that you're fully capable of making a decision on whether or not to agree with the orders?

4

A.     Yes.

Q.     Okay. And I also asked you if you received a copy of the petition that was filed by the Department when you were served with your papers.

A.     Yes.

Q.     And you did receive that, correct?

A.     Yes.

Q.     And you have had an opportunity to read the petition as well, haven't you?

A.     Yes.

Q.     And you did read the petition?

A.     Yes.

Q.     And you understand that at this point forward if you don't complete the services that the Department is asking you to complete successfully and if the Department does not feel it's safe to return [M.C.] to your care, that the Department would be asking the court for termination of your parental rights?

A.     Yes.

Q.     When is the last time you've spoken with [M.C.]'s father, [A.C.]?

A.     Saturday.

Q.     And how did you have contact with him?

A.     I left a voice message on his cell phone.

Q.     Okay. And you recently came to Texas from Oklahoma. Is that correct?

A.     Yes.

5

Q.      And [M.C.] was born in Oklahoma?

A.      Yes.

Q.      And when he was born in Oklahoma, were you living with his father, [A.C.]?

A.      Yes.

Q.      Okay.  And [A.C.] and you are not legally married.  Is that correct?

A.      Yes.

Q.      But you believe he is the father?

A.      Yes.

Q.      Do you have any doubt in your mind that [A.C.] is the father of [M.C.]?

A.      No.

Q.      And you completed an affidavit of status stating that you believe he is the father, correct?

A.      Yes.

Q.      And has [A.C.] accepted [M.C.] as his child?

A.      Yes.

Q.      Has he expressed to you that he believes he is [M.C.]'s father?

A.      Yes.

Q.      Is his name on the birth certificate in Oklahoma?

A.      Yes.

Q. What is your understanding of why [M.C.] came under the care or into the care of the Department?

A. Because I wasn't supervising him enough and I wasn't paying attention to him.

Q. And [M.C.] was born in April of this year. Is that correct?

A. That's correct.

Q. And where are you currently living?

A. I'm homeless.

Q. And when you came—since you've come back to Texas in June of this year, have you been homeless the entire time?

A. No. I was staying with Friends of the Family for a while.

Q. Okay. And then you left Friends of the Family on your own. Is that correct?

A. That's correct.

Q. When you left Friends of the Family, you left with [M.C]. Is that correct?

A. That's correct.

Q. Have you been employed in any manner since you've been back to Texas?

A. No.

Q. So you did not have the financial resources to care for [M.C.], did you?

A. That's correct.

Q. Okay. And [M.C.] was hospitalized after he was born at Cushing Regional Hospital. Is that correct?

A.     That's correct.

Q.     Can you tell us what led up to the hospitalization?

A.     He had a sore on his knee, and it turned out to be like a —they said it was either a burn or a chemical burn.

Q.     Okay.  Do you know what could have caused the chemical burn?

A.     It was—what his grandfather told me, because I had let his grandfather watch [M.C.] for a few minutes and he put him down on his couch, which [M.C.] put his knee underneath the couch and started rubbing.  And he didn't notice that until after he picked [M.C.] up.

. . . .

Q.     Does [A.C.] use illegal drugs?

A.     Yes.

Q.     Which drugs?

A.     Toluene.

Q.     And toluene is?

A.     Paint thinner.

Q.     Okay.  And he huffs it?

A.     Yes.

Q.     And how often does [A.C.] use or huff toluene?

A.     Every day.

Q.     Did you ever leave [M.C.] in his care?

A.     No.

8

Q. Was—did [A.C.] support you financially while you were pregnant with [M.C.]?

A. No.

Q. During your pregnancy, where did you live?

A. A hotel.

Q. Was that here in Texas?

A. Yes.

Q. And where at? In Denton or another city?

A. Denton.

Q. And how did you take care of yourself during your pregnancy?

A. I had another friend of mine take care of me, and I was raking leaves.

Q. Okay. And where was [A.C.] when you were living in the hotel during your pregnancy?

A. In jail.

Q. And was he in jail for huffing?

A. Yes.

Q. Towards the end of your pregnancy, did you go to live with [A.C.] in Oklahoma?

A. Yes.

Q. And did he help support you then?

A. No.

Q. Who was supporting you when you were living with him in Oklahoma?

A. His grandfather.

. . . .

Q. Okay. Do you feel that [A.C.] would be an appropriate caretaker of [M.C.]?

A. No.

Q. Why not?

A. Because he does the drugs and I don't trust him.

Q. Okay. Was [A.C.] ever abusive to you?

A. Yes.

Q. In what ways?

A. Physical.

Q. How would he physically abuse you?

A. He would throw me down, he would choke me, he would hit me with his fist, and he would throw spray paint on me.

Q. When he—was he physically abusive to you while you were pregnant . . . ?

A. No.

Q. When some of those times—or during any of those times, when he was physically abusive to you, throwing you down, hitting you, or choking you, was [M.C.] in the room?

A. No.

Q. Were you ever holding [M.C.] when he was abusive to you?

10

A. No.

Q. Okay. And you read the order, and you understand all the services the Department is asking you to complete?

A. Yes.

Q. And you understand how important it is for you to complete those services?

A. Yes.

Q. And you understand that if you have any questions about your services or if you have problems calling your service providers or getting there that you need to communicate to your case worker?

A. Yes.

[TDFPS ATTORNEY]: Pass the witness.

THE COURT: Do you have any other testimony that you wish to offer, ma'am?

[APPELLANT]: No.

Next, someone appearing on behalf of the M.C.'s ad litem questioned

Appellant:

Q. . . . . Do you understand that under these orders that you're not going to be the primary caretaker of your son [M.C.]?

A. Yes.

Q. And do you also understand that under these orders that your contact with your son is going to be limited to supervised visitation at least on a temporary basis?

A. Yes.

Q.     Okay.  And do you agree that these orders are in the best interest of your son?

A.     Yes.

After the questioning, the trial court advised Appellant:

THE COURT:     Okay.  Then based upon what has been presented, the court will approve the agreed temporary order and I will sign that order.  I do need to advise you, [Appellant], that the CPS service plan is a very important document.  Its purpose is to help you provide your child with a safe environment within a reasonable period specified in the plan.  If you are unwilling or unable to provide your child with a safe environment, your parental or custodial duties or rights could be restricted or terminated.  Do you understand that?

[APPELLANT]:     Yes.

THE COURT:     Okay.  It's important that you get a copy of this order before you leave here today because it tells you not only what is required of you but it also tells you when the next hearing will be.  So you need to have a seat, and once you've received your copy of it today, then you're free to go for today, okay?

[APPELLANT]:     Okay.

Appellant also appeared at the status hearing held August 7, 2008.  The following transpired:

THE COURT:     Okay.     [Appellant] is here and—where is [Appellant]?

Okay.  And you have agreed—have had an opportunity to review the status hearing order which

12

has been submitted to the court. It appears as though you are agreed to it. Is that correct?

[APPELLANT]: Yes, ma'am.

THE COURT: You do not have an attorney to represent you at this time?

[APPELLANT]: Right.

THE COURT: Okay. I'll start with you. You do understand, and I probably told you before, that you have the right to hire an attorney to represent you before you enter into any agreements in this case. Do you understand that?

[APPELLANT]: Yes.

THE COURT: If you applied to the court and could show that you were indigent, you would be entitled to a court-appointed attorney to represent you. Do you understand that?

[APPELLANT]: Yes.

THE COURT: And despite the fact that you do not have an attorney to represent you today, you wish to enter into this agreement and have it become the order of the court. Is that correct?

[APPELLANT]: Yes.

. . . .

THE COURT: Have you filled out paperwork for a court-appointed attorney?

[APPELLANT]: We both have.

THE COURT: You both have. Okay. Why don't you present those to me.

13

. . . .

[APPELLANT]:     He hasn't finished his.

. . . .

THE COURT:     . . . . Understanding that now, [Appellant], you've filled out a form requesting a court-appointed attorney. However, are you still wanting to agree to this order for today and have a court-appointed attorney for any future hearings?

[APPELLANT]:     Yes.

THE COURT:     That is what you want to do?

[APPELLANT]:     Yes.

Next, the attorney for TDFPS questioned Appellant:

Q.     . . . [Y]ou've had an opportunity to sit down with your case worker Amy Yi and go over the service plan?

A.     Yeah.

Q.     Regarding the services you need to complete, correct?

A.     Correct.

Q.     And you understand those services?

A.     Yes.

Q.     And you understand the importance of those services?

A.     Yes.

Q.     You understand that if you do not successfully complete those services that the Department may recommend or proceed with termination of your parental rights to [M.C.]?

A. Yes.

. . . .

THE COURT: Ma'am, since you are essentially representing yourself here today for the purposes of this hearing, is there any other testimony that you wish to offer?

[APPELLANT]: No.

At the end of the hearing, the following occurred:

THE COURT: Okay. [Appellant], do you have anything further you wish to bring before the court today?

[APPELLANT]: No.

. . . .

THE COURT: Okay. Then based upon everything that's presented, including the CASA report which I have had an opportunity to review, the court will approve and sign the status hearing order which has been submitted that is agreed to by all parties.

I do need to advise . . . you, [Appellant] . . . that the CPS service plan is a very important document. Its purpose is to help you provide your child with a safe environment within a reasonable period specified in the plan. If you are unwilling or unable to provide your child with a safe environment, your parental and custodial rights could be terminated or restricted.

Do you understand that, [Appellant]?

[APPELLANT]: Yes.

. . . .

THE COURT:    Okay.  Both of you need to get a copy of this order before you leave here today because it's going to notify you of when the next hearing is.

. . . .

I'm going to try to go ahead and appoint you somebody, [Appellant], that you can talk to before you leave here today.  So if you'll just have a seat, when y'all get these—your copies of this order and we have the attorney issue resolved, then you're free to go, okay?

[APPELLANT]:    Okay.

Appellant did not personally appear at any of the remaining hearings, including the bench trial, but she was represented by counsel at all of them.

## Section 263.202 Finding

In her first point, Appellant complains that the trial court failed to make a finding under section 263.202 of the family code that she understood the service plan and proceedings which may result in a restriction or termination of her parental rights to M.C.[2]  But, as TDFPS points out, the trial court did find in its first status hearing order that Appellant

has reviewed and understands the service plan and has been advised that unless she is willing and able to provide the subject child with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or to termination or the subject child may not be returned to her.

We therefore overrule Appellant's first point.

---

[2] *See* Tex. Fam. Code Ann. § 263.202(b)(2) (Vernon 2009).

16

**No Bona Fide Doubt of Appellant's Competency**

In her second point, Appellant contends that the trial court should have sua sponte ordered a competency evaluation for her because of evidence that her bipolar disorder was untreated and also argues that the trial court's failure to order the competency evaluation was fundamental error and violated her rights to due process. As TDFPS points out, the family code does not prescribe a competency standard that parents must meet before participating in a hearing or trial.[3] Without engrafting such a standard on the family code, we conclude that even if parents in Texas were required to be competent or were entitled to a competency evaluation before termination proceedings, Appellant's arguments would fail.

Appellant appears to equate untreated bipolar disorder with incompetency, but they are not the same. In criminal law, to which Appellant likens the termination proceeding, a person is incompetent if she does not have (1) sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding or (2) a rational as well as factual understanding of the proceedings against her.[4] As the Texas Court of Criminal Appeals has explained,

> If a trial judge has a *bona fide* doubt about the competency of the defendant, he or she shall conduct an informal inquiry to determine if there is evidence that would support a finding of incompetence. A *bona*

---

[3] *See In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

[4] Tex. Code Crim. Pro. Ann. art. 46B.003(a) (Vernon 2006); *Montoya v. State*, 291 S.W.3d 420, 425 (Tex. Crim. App. 2009).

*fide* doubt may exist if the defendant exhibits truly bizarre behavior or has a recent history of severe mental illness or at least moderate mental retardation.[5]

But we have reviewed the entire record, including Appellant's testimony at the two hearings she attended, the testimony of two CPS caseworkers and the CPS investigator, the CASA supervisor's testimony, and Appellant's MHMR records, and we conclude that the record does not demonstrate sufficient evidence to raise a bona fide doubt in the trial court's mind about Appellant's competency to stand trial.[6] Accordingly, even if the law did recognize a parent's right to have a competency evaluation at any stage of the termination proceeding, we hold that nothing in this record would trigger that right for Appellant. We overrule Appellant's second point.

**No Ineffective Assistance of Counsel**

In her third point, Appellant contends that her trial counsel was ineffective for failing to request a competency evaluation below. Because we have already held that nothing in the record shows a bona fide doubt as to Appellant's competency, we hold that Appellant's claim of ineffective assistance of counsel fails.[7] We overrule her third point.

---

[5] *Montoya*, 291 S.W.3d at 425.

[6] *See id.*

[7] *See In re J.O.A.*, 283 S.W.3d 336, 343 (Tex. 2009); *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003).

In her fourth point, Appellant contends that requiring postjudgment testimony by trial counsel to support an appellate claim of ineffective assistance when an appellate record is not yet available violates a parent's due process rights by denying her an effective appeal. Because we have already held that the record demonstrates no bona fide doubt of Appellant's competency and that her claim of ineffective assistance fails for that reason, we overrule her fourth point.

**Conclusion**

Having overruled all of Appellant's points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: May 27, 2010